**John Henry QUINONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 62117.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 9, 1980.

Rehearing Denied Feb. 13, 1980.

Stanley G. Schneider, Houston, for appellant.

Carol S. Vance, Former Dist. Atty., John B. Holmes, Jr., Dist. Atty., Michael C. Kuhn, Jack D. Bodiford and Rusty Hardin, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

Appellant raises various grounds of error stemming from the use of a tape recording of a conversation between appellant and an accomplice. Appellant also claims that the indictment is duplicitous, that the court erred in refusing to order discovery or independent examination of a pistol, that the charge to the jury on guilt failed to define the offense, that evidence of an extraneous offense was improperly admitted in the punishment phase, and that the charge to the jury on punishment was insufficient.

The evidence, which is sufficient to support the conviction, will be summarized so the matters discussed may be more clearly understood. On the afternoon of June 15, 1978, appellant and Robert Leal visited Simonia Sendejo at her home. Both Leal and Sendejo noticed that appellant was carrying a pistol. Appellant left the Sendejo house but soon returned in a neighborhood ice cream truck. The truck, which the appellant had hijacked, was being driven by Mohammed Ali Vahdat.

Appellant waved Leal and Sendejo over to the truck and told them to get in. Appellant forced Vahdat to begin driving to a Houston-area drive-in theater. During the drive, appellant pocketed the money in the truck, took Vahdat's money, watch and wallet, appropriated a tape player, and struck Vahdat with a gun. Appellant then told Leal to drive and forced Vahdat to the back of the truck. Appellant struck Vahdat re-

peatedly during the remainder of the trip to the theater.

At the theater, appellant told everyone that because he was on parole and did not want to return to jail he would have to kill Vahdat. Sendejo fled. Leal also abandoned the truck and saw it leave the theater. About thirty minutes later the appellant returned in the truck and informed Leal that he had sexually assaulted Vahdat. Other witnesses overheard Vahdat moaning and pleading for his life.

Appellant ignored attempts by the theater staff to dissuade him from killing Vahdat. Accompanied by Gilbert Mendez and Richard Wayne Collins, who both followed him in another vehicle, appellant drove the ice cream truck away from the theater. Late that evening the abandoned ice cream truck was found by police. The next day, the body of Mohammed Ali Vahdat was discovered in a wooded area outside the Houston city limits. The cause of death was a gunshot wound to the head. No weapon or bullets were found at the scene. Expert testimony indicated that the fatal bullet could have ranged from .25 to .38 in caliber.

News of the death appeared in the newspapers. After reading the news an acquaintance of appellant, Christina Rosas, asked appellant about it. She testified that appellant admitted the killing, laughed about it and stated: "You're going to see me on Channel 11 and Channel 13. John Henry Quinones."

On June 17, Richard Wayne Collins was apprehended on unrelated charges at a Houston motel. Collins gave the police a 7.65 mm. automatic pistol which he said did not belong to him. Other testimony identified this pistol as the one being carried by appellant on June 15, although the witness, Robert Leal, described the pistol as being a .32 caliber automatic pistol. During questioning, Collins began giving information about the Vahdat murder. On June 22, Collins agreed to wear a tape recorder in an effort to secure a taped conversation between Collins and appellant about the crime. After receiving the tape of this conversation, the police arrested appellant for capital murder.

Appellant was indicted on July 12. On July 20, the trial court held a hearing on appellant's pretrial motions. Paragraph (b) of appellant's motion for pretrial discovery asked for discovery of "all recorded statements allegedly made by the Defendant, if any continuing . . . ." At the hearing the court, in reviewing the motion, engaged in the following colloquy:

"THE COURT—Paragraph b.): All recorded statements allegedly made by the Defendant.

"Are you speaking about mechanically recorded statements?

"MR. COLLINS [one of the defense attorneys]: Yes, your Honor.

"THE COURT: Observations, Mr. Bodiford?

"MR. BODIFORD [an Assistant District Attorney]: There are none.

"THE COURT: That would not be discoverable, if I understand the provisions of Article 39.14. I do not believe a mechanically recorded statement is discoverable under Article 39.14.

"You say you have none anyway. How do you want me to state that; denied?

"MR. BODIFORD: The State asks it be denied."

The discovery request was denied. Although appellant himself was aware of the existence of the tape from the time of his arrest, his attorneys first learned of the tape from Collins' attorney on September 13.

On September 18, the first day of trial, appellant attempted to move for production of the tape recording. The trial judge refused to hear the motion since he held that it was untimely filed. On September 25 the State introduced testimony about how the tape recording was obtained and made. The next day, appellant filed a motion for continuance, requesting additional time to examine the tape, and a motion for court appointment of an independent expert to examine the tape. Both of these motions were denied.

Portions of the tape were played before the jury during the guilt phase of the trial and the entire tape was played during the punishment phase. The tape contained a fifteen second tapeover which, according to the State's witnesses, was caused by an officer accidentally pressing the "record" button on the machine. The recorded conversation, in pertinent part and including the tapeover, was as follows:

"QUINONES: Went, mmm boy, I tell you I gonna call that chick out that day.

---

BREAK IN TAPE, TAPEOVER IN NARCOTICS DIV., LT. THOMAS' OFFICE

"SCHULTEA [a police officer]: Four, testing, one—go to ID man, and they act like you committed a crime—pick up right there.

"COLLINS: Let's go ahead and listen to it, he's just fixing to get to the part where—

"NIXON [a police officer]: Where we want to hear.

"SCHULTEA: Quit foolin with it—

---

END TAPEOVER, 15 SECOND DURATION

---

"COLLINS: Hey man, the cops, cops got that gun.

"QUINONES: I know that.

"COLLINS: They got it, I don't think they know where it come from though.

"QUINONES: Well hey, they reported it hot, the ones, the people who had it.

"COLLINS: They did . . . Where'd you get that motherfucker, Mexico or somethin?

"QUINONES: From here, that's what we used to, uh, hold-up the 13G's.

"COLLINS: What, the THC?

"QUINONES: There ain't no heat in that man, there ain't no heat in that man.

* * * * * *

"COLLINS: What, like if—if—if the heat comes down, man, like, what a— about bond man?

"QUINONES: Don't worry about no heat man, don't even worry about it no more. Just as long, Johnny Morales, I don't know if they told you about it, (indecipherable word) him in the night, man, they investigated it, but let me tell you, ain't nobody seen me, ain't nobody seen you, in that car, man, ain't anybody even knows you fuckin had nothing to do with it. Only person knows man, me— you—see the only ones who saw the actual murder man, just me, you and Gilbert. Gilbert ain't even been the drive-in no more. He's staying clear, man.

"COLLINS: Dig it.

"QUINONES: I ain't—

"COLLINS: He move,—he moved didn't he?

"QUINONES: Yeah, I think so. I ain't been stealing nothing. I did a little stealing here and there, just some bullshit shit, you know what I mean, but, uh, I'll tell you about some shit, if you want to, man, you can go with us, man, but it will come out of my cut, or you can loan me your car in the mornin, man. We steal in the mornin, man, early . . . pick up my cousin, man, you know which one I'm talking about, man, that big one, with all them tattoos? Me and him goin to do, not no robbery, no going to be no heat on this car, man, all we just need is something to load up some shit on, like hot items.

"COLLINS: Yeah, well . . .

"QUINONES: All we going to do is steal some shingles.

* * * * * *

"COLLINS: What's you do with that tape deck, man, think I might get that mother fucker man, and fucking put it in my ride, man.

"QUINONES: Can you hook it up right fast, man?

* * * * * *

"COLLINS: That scared—I don't you know—that, when—when you shot that dude, I don't believe I could have done that, man.

"QUINONES: Huh?

"COLLINS: I got a weak stomach.

"QUINONES: Well, shit man—

"COLLINS: I was too happy to at the time man, I mean I was high, man . .

"QUINONES: Not did it because I was high, man, but I thought about it hard, man, I didn't want to kill that dude, man, I didn't want to kill him, you know what I mean? (Quinones yawning while talking, unintelligible words.)

"COLLINS: I read about this shit in the newspaper man.

"QUINONES: Yeah, they told me they got the clippings out. I'm going to read it whenever they find it, they put it up somewhere. Anyway, uh, did you, uh,—I don't know, man, it's just—it's just a matter between you going to the pen, man, for robbery, man, or you taking a chance of murdering him, man, and get busted.

\* \* \* \* \* \*

"COLLINS: I tell you man, I'm going to quit, you know, like coming around for a while.

"QUINONES: All right, that's cool, brother, but like I said, the only reason I asked you down, cause I need a little money see all we're going to do, like I said, is go and see what we can do, me and him, cause he knows the places, and he needs some help. I make maybe fifty, a hundred dollars, two hundred, within a day, man, cause we go early, and I give you half. See he's a junky, so he gets half, and I don't try to take none of his cash, man, cause he needs it, he—he's sick man.

"COLLINS: Yeah.

"QUINONES: See, half of my cut, you know what I mean, will be anywhere from fifty to a hundred, you gotta—you gotta play the game man, and—

"COLLINS: I—you can use the car, man, but the—there's heat on the car, man, cause, you know, if—if they saw it, you know, at that place, you know—

"QUINONES: You worry too much, man, I take good care of my people, like when you keep talking about that night, man, don't worry about this shit, man. Don't even think it man. I don't even like talking about it, man. Shit, I be passin my time like 'sta bien, shit, I ain't even seen—I ain't even thought bout—bout it, cause I know what it's going to be cool for me on my side of it, and as far as you side, it's a lot cooler than my side, man, cause I got a lot more heat comin looking down at me, and that's just a lot of witnesses seen me, you know what I mean, and they won't, uh, talk if they do find out, you know what I mean, cause they're scared—scared."

In four basic arguments relating to the use of the tape recording the appellant asserts that the trial court erred: (1) in not permitting discovery of the tape recording, (2) in not granting appellant's motion for a continuance, (3) in not appointing an independent expert to examine the tape; and (4) in admitting the tape in evidence. We will deal with each of these in turn.

■ The threshold issue in analyzing the discovery question is whether the tape recording was discoverable material within the meaning of Art. 39.14, V.A.C.C.P. Art. 39.14 provides:

"Upon motion of the defendant showing good cause therefor and upon notice to the other parties, the court . . . may order the State . . . to produce and permit the inspection and copying or photographing by or on behalf of the defendant of any designated documents, papers, written statement of the defendant, (except written statements of witnesses and except the work product of counsel in the case and their investigators, and their notes or report), book, accounts, letters, photographs, objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action . ."

Tape recordings of a statement by the accused are "objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action."

The work product privilege has generally been limited to documents which themselves do not contain admissible evidence of the offense but instead are summaries of the evidence or discussions about the offense that have been prepared for the internal use of law enforcement officers. The privilege has thus been extended to offense or investigative reports prepared by the police, e. g., *Brem v. State*, 571 S.W.2d 314 (Tex.Cr.App.1978); *Holloway v. State*, 525 S.W.2d 165 (Tex.Cr.App.1975); internal prosecution files or papers, e. g., *Mott v. State*, 543 S.W.2d 623 (Tex.Cr.App.1976); *Nelson v. State*, 511 S.W.2d 18 (Tex.Cr.App. 1974); and reports on the analysis of narcotics, e. g., *Alba v. State*, 492 S.W.2d 555 (Tex.Cr.App.1973); *Feehery v. State*, 480 S.W.2d 649 (Tex.Cr.App.1972). It has also been extended to statements prepared by law enforcement officers after interviewing prospective witnesses. *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr.App.1974). However, under the *Gaskin* rule, statements prepared by witnesses for the State are not privileged after they testify, id.; nor does the privilege extend to any statement that is used before the jury. E. g., *Mendoza v. State*, 552 S.W.2d 444 (Tex.Cr.App.1977). This tape recording contained direct, material evidence about the offense and its contents were dictated by appellant and Collins, not by the police officers. When the police record the incriminating statements of a criminal suspect who subsequently is charged with the offense, there is a substantial probability that, as in this case, these recorded statements will be used at trial and were not meant for strictly internal use. Moreover, if the tape recording contained exculpatory material it would be discoverable as a matter of constitutional right. See *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In contrast to the recorded statement of an ordinary witness, the work product privilege was not designed for and has not been applied to shield the recorded statements of the accused.

A holding that such recordings could *never* be discoverable would handicap the trial court in the performance of its duty to effectuate important purposes of pretrial discovery, such as the reduction of surprise and the insurance of a fair trial. The trial court did have the discretionary power to order discovery of this tape recording. *Bates v. State*, 587 S.W.2d 121 (Tex.Cr.App.1979). We also observe that, generally, it is the better practice for the prosecutor to disclose to the defense any written or recorded statements of the defendant that are in his custody. See ABA Standards, Discovery and Procedure Before Trial, Sec. 2.1(a)(ii) (Tent.Draft 1969).

However, appellant does not have a general *right* to discovery of evidence in the possession of the State, even if the evidence is appellant's own statements. See *Cicenia v. LaGay*, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958); *Dowling v. State*, 167 Tex.Cr.R. 43, 317 S.W.2d 533, cert. denied, 358 U.S. 886, 79 S.Ct. 127, 3 L.Ed.2d 114 (1958). Art. 39.14 makes it clear that the decision on what is discoverable is committed to the discretion of the trial court. The issue, then, is whether the trial court abused its discretion in refusing to allow discovery of the tape recordings. The basis for the ruling by the trial court was incorrect; it was based on the incorrect assumption that no tape recording existed and it was based on the incorrect belief that, even if the tape did exist, it would not be discoverable. But the reasons behind the trial court's exercise of its discretion will not create reversible error if the decision itself, regardless of its purported basis, did not exceed the limits of the court's discretion. Cf. *United States v. Agurs*, 427 U.S. 97, 108–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (using similar analysis in explaining the appellate role on this issue in the constitutional context).

The legal standard employed in determining whether the trial court abused its discretion is *not* whether the error was harmless. A trial court is not obligated to allow discovery of evidence merely because its admission will harm the defendant. Compare *Hollowell v. State*, 571 S.W.2d 179 (Tex.Cr.App.1978) with *Stone v. State*, 583

S.W.2d 410 (Tex.Cr.App.1979). Instead, Texas has chosen to follow a rule which requires the trial court to permit discovery only if the evidence sought is material to the *defense* of the accused.

■ Traditionally, this Court has declined to find reversible errors stemming from discovery if the defendant was not denied access to exculpatory or mitigating evidence which would have affected the outcome of the trial in his favor. See e. g., *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr. App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Love v. State*, 533 S.W.2d 6 (Tex.Cr.App.1976); *Bell v. State*, 442 S.W.2d 716 (Tex.Cr.App.1969); *Means v. State*, 429 S.W.2d 490 (Tex.Cr. App.1968); see also *Bates v. State*, supra. More recently in *Stone v. State*, 583 S.W.2d 410 (Tex.Cr.App.1979) and *Frank v. State* 558 S.W.2d 12 (Tex.Cr.App.1977), this Court has expressly chosen to define "materiality" under Texas law in the due process terms employed by the Supreme Court in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), one of the more recent elaborations on the disclosure requirements of *Brady v. Maryland*, supra.

" '. . . unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' The Court stated that the test for materiality imposes a higher burden on the defendant than the harmless error standard. In determining materiality, the omission must be 'evaluated in the context of the entire record,' and constitutional error is committed only 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.' "

*Stone v. State*, 583 S.W.2d at 415, in part quoting *United States v. Agurs*, 427 U.S. at 108–10, 112, 96 S.Ct. 2392. See also *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Garrison v. Maggio*, 540 F.2d 1271 (5th Cir. 1976). Keeping this standard in mind, we proceed to apply it to this case.

The tape recording was made during the police investigation of the crime, prior to appellant's arrest; it is not a custodial confession and there is no dispute as to the voluntariness of appellant's recorded statements. More importantly, there are no statements on the tape that are exculpatory in any way. This is not a case where the prosecutor sought to withhold evidence that the defense could have advantageously presented to the jury; it is just the opposite.

Nevertheless, appellant argues that he was prejudiced by the failure to discover the tape recordings because counsel for appellant claim that, had they known of the tapes, they would have accepted a prosecutorial offer to plead guilty in exchange for a recommended life sentence, an offer which had been withdrawn by the time counsel learned about the existence of the tape. This claim of prejudice does not make the tape "material," as that term is defined in *Stone* and *Agurs.*

■ This argument essentially complains of the way in which the prosecutors chose to conduct their plea negotiations, because it means that the prosecutors offered a plea of guilty but, in negotiating for this plea, they chose not to reveal evidence which appellant asserts would have caused their offer to be accepted. We will not indulge in speculation about why the prosecution made this choice during plea negotiations and we will not intervene into that process. The offer of a plea and the circumstances surrounding that offer are generally within the discretion of the prosecutor. *DeRusse v. State*, 579 S.W.2d 224 (Tex.Cr.App.1979). If the prosecutor chooses not to be sufficiently persuasive in making his offer, for whatever reasons, or if he makes no offer at all, the defendant is equally without legal recourse. Additionally, discovery of the State's evidence prior to trial so as to permit more effective plea

bargaining is not a component of the constitutional right to effective assistance of counsel. The true focus of analysis returns to the test explained in *Stone* and *Agurs*, which is not met in this case.

■ Appellant also complains that he was generally denied both a fair trial and the opportunity to obtain effective assistance of counsel because of the prosecutor's failure to disclose the existence of the tape recording to the trial judge during the pretrial hearing on the motion for discovery. At the hearing on the motion for new trial, the assistant district attorney testified that at the hearing he had been fully aware of the existence of the tape recording but stated that his answer, "There are none," really was meant to imply that he did not believe there were any tapes that were discoverable. This is equally improper, regardless of the good faith of those involved, since, under the circumstances, discoverability was a decision for the court, not the prosecutor. We do not mean to show approval for this conduct, yet we do not hold that the sanction for it is reversal of this conviction. This problem, and the action to be taken, is primarily within the realm of the trial judge. From the appellate perspective, the inquiry is still whether due process was accorded under the standards already explained. Again this is not a case of suppression of exculpatory evidence. The evidence was incriminating and the appellant has not shown that he would have gained any exculpatory benefits in the trial of the case from pretrial disclosure.

■ The second major argument made by appellant concerning the tape recording is that the trial court should have granted his motion for a continuance to examine the tape. This motion was filed after the beginning of trial. Therefore, to obtain a continuance appellant was required to satisfy the trial court that he was surprised "by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated . . . ." Art. 29.13, V.A.C.C.P.

The motion for continuance was filed on September 26, before the start of the second day of testimony. Appellant asserts that the "unexpected occurrence since the trial began" was the introduction of testimony on September 25 that a tape recording had been made. However, counsel for appellant testified at the hearing on the motion for new trial that they were aware of the existence of the tape as early as September 13, five days before the trial began. Admission of testimony about the tape on September 25 was not an unexpected occurrence during trial. Admission of such testimony could have been reasonably anticipated. E. g., *Jones v. State*, 501 S.W.2d 677 (Tex.Cr.App.1973). Appellant also did not make the showing as to how he would benefit from the continuance. See, e. g., *Ewing v. State*, 549 S.W.2d 392 (Tex. Cr.App.1977); *Leach v. State*, 548 S.W.2d 383 (Tex.Cr.App.1977). The trial court did not abuse its discretion in denying the motion.

Appellant further contends that the trial court erred in overruling his motion for appointment of an independent expert to review the tape recording to determine its authenticity. This motion was also filed on September 26, well after the beginning of trial. However, even if the motion were timely, appellant has not properly preserved this ground of error for appeal in a motion for new trial.

The primary purpose of the motion for new trial is to bring errors to the attention of the trial court and allow that court an opportunity to act on them before invoking the appellate process. Effectuation of this purpose also helps insure that the record adequately reflects the nature of the error complained of on appeal.

■ Appellant had no absolute right to a court-appointed independent expert to evaluate the tape. This absolute right has only been extended where the defendant requests an independent examination of the physical evidence of the criminal offense, such as the drugs in a drug possession case. See *Terrell v. State*, 521 S.W.2d 618 (Tex. Cr.App.1975); *Detmering v. State*, 481 S.W.2d 863 (Tex.Cr.App.1972). Such evi-

dence is legally "indispensable to the State's case." *Bates v. State*, supra. Tape recordings like the one in this case, while very incriminating, are not so legally indispensable, id.; their exclusion from evidence would not affect the essential proof that appellant committed an offense.

 Consequently, to show error in the ruling of the court, appellant was required to show that appointment of the expert was necessary to a fair trial in the case. The tape was well authenticated before its admission into evidence. The State also offered, through testimony, a credible explanation for the fifteen second deletion in the tape and their explanation is consistent with the transcript of the tape in the record. In bringing this matter to the trial court's attention at the motion for new trial, appellant was obligated to show or attempt to show: (1) that an expert was available for the court to appoint and (2) that this expert would have given testimony useful to the defense. See *Rodriguez v. State*, 513 S.W.2d 22 (Tex.Cr.App.1974); *Parsons v. State*, 160 Tex.Cr.R. 387, 271 S.W.2d 643 (1954); *Qualls v. State*, 131 Tex. Cr.R. 606, 100 S.W.2d 711 (Tex.Cr.App. 1937). Without such a showing, both the trial court and now this Court are being asked to order new trials based on pure speculation.

Appellant did reurge his request for an independent examination of the tape at the hearing on the motion for new trial. The discussion was as follows:

"MR. SCHNEIDER: In regards to Section 5 under 39.14, I believe we had a right to an expert appointed by the Court to determine the authenticity of the tape. We made that request once when it was introduced into evidence—or I believe the third day of trial we made a request for appointment of an expert for that purpose. In the case of Derming (phonetic) v. State, in volume 43, S.W.2d, the State said an indigent was entitled to an expert. . . .

"For these reasons we ask the Court to grant our motion for a new trial.

"THE COURT: Does the State have anything?

"MR. HARDIN: . . . As to Paragraph 5, the State would be willing at this time to honor any type of request the defense wants to—as to experts to check the tape and verify the authenticity and run whatever tests they want on the original tape now in evidence. If the Court would be willing, the State suggests that it is possible for number five. We certainly have nothing to hide as to the authenticity of the tape. If they have an expert on the case it is the State's position, if the Court is willing, they are welcome to it."

Appellant's counsel did not say anything further about the matter. The requisite showing on the availability and potential testimony of the expert was not attempted. Nothing is preserved for review.

 The final contention with respect to the tape is that it was improperly admitted into evidence. The predicate for admission of tape recordings into evidence was set forth in *Edwards v. State*, 551 S.W.2d 731 (Tex.Cr.App.1977):

". . . (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement."

Id. at 733. The *Edwards* court added that some of these requirements did not need direct proof if they could be inferred from the testimony. Id.

Appellant argues that the predicate was defective because the tape had been altered by the fifteen second tapeover and because there was no showing that the statements of Richard Wayne Collins were voluntary. At the time this tape was introduced into evidence, appellant objected, stating:

"We would renew all our previous motions and objections to the admissibility of State's Exhibit 39 and previously heard prior to yesterday, your Honor, and also in the courtroom yesterday afternoon."

This objection did not inform either the trial judge or the prosecutor which of the seven *Edwards* requirements had specifically not been met. As in *Harris v. State,* 565 S.W.2d 66 (Tex.Cr.App.1978), we hold that the objection to admission of the tape was "too general to preserve error." *Id.* at 70.

■ In addition, the *Edwards* requirements do not mean that any alteration in a tape renders the tape per se inadmissible. If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of the evidence, the recording can still be admitted. The trial court did not abuse its discretion in accepting the explanation for the alteration in this case.

■ There was also no need to prove that the recorded statements of Collins were voluntary. The relevant statements were those made by appellant. The voluntariness of those statements, made by appellant before his arrest or apprehension, is not questioned.

■ Appellant further argues that admission of the tape recording was an unconstitutional denial of his right to confront and cross-examine Richard Wayne Collins under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* held that it was improper to use the confession of a codefendant to inculpate the defendant in their joint trial where the codefendant does not take the stand. We doubt that the statements of Collins in the recorded conversation constitute a confession. In any event, this case does not present a *Bruton* problem because appellant is definitely inculpated by his own statements in the recording, not those of his codefendant. Cf. *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality opinion) (admission of defendant's "interlocking" confession allows admission of nontestifying codefendant's

confession). The damage which the recorded statements of Collins may have added to that done by appellant to himself, along with the other incriminating evidence, is so relatively insignificant that the admission of these statements was harmless error. See *Parker v. Randolph,* 99 S.Ct. at 2141–43 (1979) (Blackmun, J., concurring); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Simpson v. Wainwright,* 439 F.2d 948 (5th Cir.), cert. denied, 402 U.S. 1011, 91 S.Ct. 2199, 29 L.Ed.2d 434 (1971); *Carey v. State,* 455 S.W.2d 217 (Tex.Cr.App. 1970).

■ Returning to consideration of appellant's remaining grounds of error, appellant contends that the indictment was duplicitous. The indictment charged that appellant did "while in the course of committing and attempting to commit kidnapping and robbery, intentionally cause the death of Mohamad Ali Vahdat . . . ." Appellant argues that this indictment charges two different offenses by charging two of the different aggravating circumstances which make this a capital murder. In the context of a similar capital murder indictment, this Court has considered and rejected appellant's contention. *Jurek v. State,* 522 S.W.2d 934, 941 (Tex.Cr.App.1975), aff'd, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), habeas corpus relief granted on other grounds, 593 F.2d 672 (5th Cir.), reh. en banc granted, 597 F.2d 590 (5th Cir. 1979). Appellant urges that under Art. 21.-24(b), V.A.C.C.P., each distinct offense must be alleged in a separate paragraph. This indictment alleges only one distinct offense. *Jurek v. State,* supra.

■ Appellant next complains that the trial court erred in refusing to allow appellant to view and inspect the 7.65 mm. (approximately .30 caliber) automatic pistol which Collins gave to the police. The officer who received the pistol incorrectly described it as a .38 caliber weapon. This pistol was admitted into evidence after Leal identified it as the pistol which appellant

had in his possession at the time the ice cream truck was hijacked, although Leal described the pistol, slightly inaccurately, as a .32 caliber automatic. Leal's identification of the pistol was not challenged at the trial. The pistol was properly admitted as demonstrative evidence of the pistol which appellant was carrying at the time Leal witnessed his activities.

There was no eyewitness testimony about the murder of Vahdat. The record does not show any direct evidence as to whether the 7.65 mm. pistol was the murder weapon. The expert testimony was that the fatal bullet could have ranged from .25 to .38 in caliber. The fatal bullet was never recovered. A search of the general vicinity where the body was found, a rural area outside of Houston, yielded some old hulls from a .38 caliber police special and some expended shotgun shells; but no bullets or shells were ever recovered that were linked to the killing or to the pistol introduced at trial.

The legal standards for review of the trial court's rulings on discovery and inspection of evidence have already been discussed. Discovery or inspection of this pistol could not have resulted in any exculpatory benefit for appellant. Since the State never proved that the pistol was the murder weapon and never found a fatal bullet, ballistics comparisons would have been fruitless. At best, appellant might have hoped to prove that the 7.65 mm. pistol was not the murder weapon. But even this conclusion would not have benefited appellant since a link between the 7.65 mm. pistol and the murder was unimportant to the State's case against appellant. We therefore conclude that the trial court did not abuse its discretion in failing to allow discovery or order independent ballistics examination of the pistol.

■ Appellant also contends that the charge given to the jury at the close of the guilt phase of the trial failed to define capital murder. The charge gave the abstract definitions for intentional conduct, robbery, and kidnapping and then applied the law to the facts as follows:

"Now, therefore, if you believe from the evidence beyond a reasonable doubt that the defendant, JOHN HENRY QUINONES, did, in Harris County, Texas, on or about June 15, 1978, while in the course of committing or attempting to commit robbery or kidnapping, intentionally cause the death of Mohamed Ali Vahdat, by shooting him with a gun, you will find the defendant guilty of the offense of capital murder and so say by your verdict."

This charge required the jury to find all of the constituent elements of the offense of capital murder in order to return a guilty verdict. Appellant argues that the charge does not define the offense of murder. This is incorrect. Murder was defined in that portion of the charge which applied the law to the facts and, with the exception of the culpable mental state which the court did define elsewhere, the definition employed terms of common understanding. Appellant did not raise this objection to the court's charge at trial and no fundamental error is shown.

■ At the punishment phase, appellant alleges that error was committed in admitting evidence that appellant committed an extraneous offense, namely, the armed robbery of an adult bookstore. Evidence of unadjudicated extraneous offenses can be admitted in the punishment phase of a capital murder trial. *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979). Appellant claims, however, that he was given no notice that the State intended to present evidence of this offense and that he was thus denied an opportunity to effectively cross-examine John Brevelle, the employee of the adult bookstore who testified to the crime.

Rusty Hardin, an Assistant District Attorney for Harris County, testified that the State did not know that Brevelle would testify until that day. Before that day, their only knowledge of the offense was a one page offense report in their file, which the defense attorneys had been allowed to review, that mentioned the robbery. The State's testimony on this issue is reproduced at length in order to detail the unusual

circumstances behind the admission of this testimony. Mr. Hardin testified:

". . . This witness was talked to by representatives of the State for the first time this afternoon around 2:00 o'clock. He was shown a photo display which until 3:00 o'clock today we had no intention of using or even talked about and he identified the defendant, John Henry Quinones, and informed us that not only was he the man who robbed him but was the same man he earlier attended a lineup with on July the 12th or 13th of this year and identified.

"At that time in the State prosecutors' files the only thing that existed about the case was a single page offense report which mentioned the robbery. When he told us he had attended a lineup in the past on this case we were unfamiliar with, we sent an investigator over to the Houston Police Department Records Division and pulled the entire offense report supplement. He brought that back over here at approximately 3:00 o'clock this afternoon and from that we determined that in fact this witness had previously identified John Henry Quinones in a lineup on July the 12th or 13th of this year but no charges were filed. That is the first time we knew that we had this man available as a witness and even possibly would call him at the punishment stage approximately an hour and a half ago.

\* \* \* \* \* \*

"Q. [by Mr. Collins, a defense attorney]: Isn't it a fact in the offense report Art Collins, the same detective who worked on this case, was also the officer that evidently talked to these witnesses?

"A. [by Mr. Hardin]: Yes.

"Q. And showed him photographs of the defendant?

"A. Yes.

"Q. Was that information within the District Attorney's file at the time of our motion hearing in July?

"A. It was not in the D.A.'s file. I discovered there were three possible

extraneous robberies committed by your man due to a confession of a co-defendant. When we went to check on those robberies about a week or so before preparing for trial, we determined in two of them no identifications. So we dropped them. That in the third one, which is this one, the one witness had given a tentative I.D. on photo but Art Collins had not followed up on it. His understanding to me was he didn't think there had ever been a lineup. There was supposed to be. He checked the files ten days ago and said that no, there never was a lineup. We assumed we did not have an I.D. on the third robbery of the adult bookstore until we found out today.

"Q. When was the subpoena issued for Mr. Brevelle?

"A. He is in response to a phone call from the District Attorney's Office at approximately 2:00 o'clock. He was met by representatives of the District Attorney's Office for the first time today around 2:30 or 3:00 o'clock and with all assurance he was never met or talked to a District Attorney about this case until this afternoon."

The State did not act in bad faith in its failure to give appellant advance notice of the testimony of Brevelle.

Under these circumstances, appellant may have been entitled to a continuance under Art. 29.13, V.A.C.C.P., to have additional time to prepare a response to this evidence, which the State concedes was material and unexpected. However, appellant did not request a continuance. The absence of a request for a continuance deprived the trial court of an opportunity to properly remedy the surprise complained of by appellant. See *Graves v. State*, 65 Tex.Cr.R. 419, 144 S.W. 961 (1912); *Bryant v. State*, 35 Tex.Cr.R. 394, 33 S.W. 978 (1896). Without such a request, nothing is presented for review. *Hubbard v. State*, 496 S.W.2d 924 (Tex.Cr.App.1973).

Finally, appellant contends that, in the punishment phase, the jury should have been charged that: "Evidence presented in mitigation of the penalty may be considered. should the jury desire, in determining the answer to any of the special issues." Appellant submitted two jury charges incorporating this language and both were denied. The trial court submitted the special issues as prescribed in Art. 37.071, V.A.C.C.P., without explanation of their terms.

Appellant correctly claims a right to consideration of mitigating circumstances by the jury deciding whether or not to impose the death penalty and he argues that the explanatory charge he requested is necessary to protect this right. We disagree with this conclusion. The Supreme Court has affirmed that under the Texas capital sentencing statute: "the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek v. Texas*, 428 U.S. 262, 273, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." 428 U.S. at 276, 96 S.Ct. at 2958. While invalidating an Ohio death penalty statute for its failure to permit adequate consideration of mitigating factors, the Supreme Court favorably contrasted the Texas law which: "survived the petitioner's Eighth and Fourteenth Amendment attack because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question— despite its facial narrowness—so as to permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show." *Lockett v. Ohio*, 438 U.S. 586, 607, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978), citing to *Jurek v. State*, 522 S.W.2d at 939–40.

Appellant was entitled to present evidence of any mitigating circumstances and did present such evidence, including a broad discussion of his personal and family background. The question then is whether the language of the special issue is so complex that an explanatory charge is necessary to keep the jury from disregarding the evidence properly before it. In *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977), cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978), this Court held that the questions in Art. 37.071 used terms of common understanding which required no special definition. The jury can readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probability of future criminal acts of violence. No additional charge is required. The ground of error is overruled.

The judgment is affirmed.

ROBERTS, Judge, dissenting.

I dissent. The judgment should be reversed because concealment of the incriminating tape recording denied appellant his constitutionally protected right to effective assistance of counsel.

The Court's analysis of disclosure in terms of *Brady v. Maryland* is wholly inappropriate. As the Court suggests, materiality in due process terms refers to the discovery of matters exculpatory in nature. Materiality under V.A.C.C.P., Article 39.14, however, has been nowhere so defined. It should be abundantly clear from even a cursory reading of Article 39.14 that the Legislature intended no such restrictive definition and that Article 39.14 was not meant to be a mere codification of *Brady v. Maryland*. Materiality in the context of Article 39.14 should be accorded its commonly understood legal meaning. As said in *Weinstock v. United States*, 97 U.S.App. D.C. 365, 367, 231 F.2d 699, 701 (D.C.Cir. 1956), "[T]o be 'material' means to have probative weight: i. e., reasonably likely to influence the tribunal in making a determination required to be made." Accordingly, the cases cited by the Court are inapposite. The Legislature has chosen, by enacting Article 39.14, to authorize a broader range of discovery than the minimum due process requirements of *Brady v. Maryland*.

The Court peremptorily dismisses appellant's claim that his right to effective as-

sistance of counsel was infringed upon, saying that ". . . discovery of the State's evidence prior to trial so as to permit more effective plea bargaining is not a component of the constitutional right to effective assistance of counsel."

I do not suggest that we should elevate plea bargaining to the status of a constitutionally protected right. I am of the view, nonetheless, that the Sixth Amendment mandates that defense counsel not be unduly hampered in the exercise of his obligation to effectively represent his client. This is so no matter what aspect of a criminal prosecution is the immediate focus of counsel's advice to his client. Accordingly, where, as here, information which is properly within the compass of discovery is denied defense counsel because of an affirmative act of misconduct on the part of the State, the defense function is crippled to the extent the information concealed has a bearing on the advice counsel might have given. To declare that counsel should have available to him, as a basis for advice to his client, all information to which he is legally entitled is to announce no new theory of law. As stated in American Bar Association, Standards Relating to the Defense Function, 227 (Approved Draft 1971), "The relationship of effective investigation by the lawyer to competent representation at trial is patent, for without adequate investigation he is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or *to conduct plea discussions effectively.*" (emphasis supplied). Quite clearly, the prosecutorial behavior of which we speak here represents an unwarranted interference with the discharge of defense counsel's duty to investigate.

It is no answer to say that the trial court could have, in the exercise of his discretion under Article 39.14, denied discovery, even had he been made aware of the existence of the tape recording. Judicial discretion is not a mere intellectual exercise which can be invoked by advertence to a hypothetical state of facts. If the trial court was led to believe, as he was, that no tape recording existed, then he cannot be said to have exercised discretion as to its discovery.

Moreover, the record is clear that the trial court erroneously believed that permitting discovery of the tape was not even within his discretion. Accordingly, the Court's citation to authority holding that discretion exercised for the wrong reason will not vitiate a judgment based thereon, so long as the decision reached is within the permissible bounds of discretion generally, has no application in this case. The anomaly of suggesting that a trial court exercised discretion when he thought the exercise of discretion was not within his power should be apparent.

The Court relies strongly on the authority of cases which deal with the failure of the State to reveal the existence of *Brady* material. As I have stated heretofore, the *Brady* standard has no application to discovery under V.A.C.C.P., Article 39.14. What is more important is that the case at bar presents no mere failure to disclose. The record reveals a deliberate misrepresentation by the prosecution.

Where the record reveals affirmative misconduct on the part of the prosecution, compounded by an erroneous trial court ruling, we should not require a showing of great harm to find reversible error. Particularly should this be so where we review the record of a capital case, which is qualitatively different from a noncapital case. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). We are not here faced with a mere failure to disclose *Brady* material. Neither are we simply faced with a failure to make disclosure under Art. 39.14. What we are confronted with is a misrepresentation. The State offered to recommend a life sentence in exchange for appellant's plea of guilty. It affirmatively misrepresented the strength of its case. As a result, appellant's counsel were misled when they advised their client on his plea, which represented a life or death decision.

I would hold that appellant was denied the right to effective assistance of counsel and would, accordingly, reverse the judgment and remand the cause for a new trial.

PHILLIPS, J., joins in this dissent.

ODOM, Judge, dissenting.

I join the conclusion that this conviction must be reversed for the underlying factual events relied on by Judge Roberts in his dissent. I differ from his conclusion only in that I would hold those facts support a finding of prosecutorial misconduct, instead of ineffective assistance of counsel. The root cause for the miscarriage in this case was not ineffectiveness on the part of appellant's counsel; it was the misrepresentation made by the prosecutor. Cf. *Ruth v. State*, 522 S.W.2d 517. No cloud should be cast on appellant's counsel for placing reliance on the representations of another professional. This conviction should be reversed for prosecutorial misconduct. I dissent to its affirmance.

CLINTON, J., joins this opinion.