**Gary Wayne McENTYRE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–85–00844–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 21, 1986.

Mark Stevens, Galveston, for appellant.

Michael J. Guarino, Dist. Atty. of Galveston, and Michael E. Clark, Galveston Cty. Asst. Dist. Atty., Galveston, for appellee.

Before SAM BASS, COHEN and DUNN, JJ.

## OPINION

DUNN, Justice.

A jury found appellant guilty of solicitation of capital murder. The court assessed punishment at 25 years confinement.

We affirm.

Robert Garcia testified that on April 24, 1985, appellant called him and asked him if he was interested in making extra money. Appellant requested that Garcia meet him at a hotel to discuss the details. At the hotel, appellant told him that he wanted Garcia to assist him in murdering someone who would have expensive jewelry as well as about $3,000.00 or more in cash on his person. Garcia was to pose as a cocaine dealer; appellant would bring the victim to Garcia's apartment to purchase cocaine where appellant would kill the victim. The money and jewelry on the victim's person would then be split between them. At this point, Garcia thought appellant was joking. He left the meeting, however, without having renounced the plan and saying he would think about it.

Later that day, Garcia met Sergeant Goetschius, of the Texas City Police Department, (TCPD), to discuss a burglary at Garcia's former place of employment. Garcia also revealed what had transpired earlier between himself and appellant. Garcia was asked to call appellant from the police station and ask appellant about his plans. Appellant suggested that they meet instead at the hotel to discuss the scheme.

Garcia was then fitted by police officers with a wireless transmitter. The only instructions he received were to wear the microphone and "go along with" appellant. Garcia testified he was not aware of a button on the equipment that could stop

the transmissions, and that the only time the equipment was touched was when the police charged the batteries. During transmission, the police could not talk to Garcia but would communicate with him by blinking their lights.

At approximately 7:00 p.m., Garcia proceeded to the hotel where appellant indicated that he had unsuccessfully tried to contact the intended victim, now revealed as Timothy Woods, a cocaine dealer. Appellant asked him to wait in a lot in front of his sister's house while appellant tried to contact Woods. Appellant's plans varied as the evening progressed, but appellant continued to express his desire to kill Woods, be it by strangling him in Garcia's car or by beating him with a baseball bat in Garcia's apartment.

Garcia further testified that appellant never indicated renunciation of these plans. In fact, when Garcia expressed reservations and asked him to abandon the scheme, appellant gave him his wallet and wedding ring as collateral because his plan was a "sure thing." Appellant also gave him a baseball bat to put in his apartment. When Garcia suggested that they only rob and not kill Woods, appellant responded that the results of not killing him would be too dangerous.

Appellant was concerned that Garcia would leave, and as they waited for Woods, he bought Garcia dinner. He also guaranteed that the proceeds would be split 50/50.

At approximately 10:00 p.m., Woods was finally contacted. When appellant went to pick up Woods, the police told Garcia to proceed with appellant's plans. Garcia then went to his apartment and waited outside for appellant and Woods, believing appellant was not familiar with his apartment. When they arrived, Woods stayed in the parking lot; appellant walked upstairs to Garcia's apartment where he was arrested.

Garcia also testified that he had never heard he had been designated as a confidential informant, and claimed he had never provided information on criminal activity to the police before this incident.

Goetschius testified that Garcia informed him of appellant's scheme and that Garcia agreed to cooperate with him in monitoring appellant's conversations. Garcia's telephone call to appellant was recorded and he was then fitted with a transmitter. Garcia's only instructions were that he was to let appellant talk and lead the conversation and that the investigation would terminate upon any renunciation on the part of the appellant.

Goetschius further testified that he was present in the surveillance van watching the encounter between appellant and Garcia and monitoring their conversations. His testimony concerning the content of the conversations corroborated that of Garcia.

Goetschius also testified that Garcia, to his knowledge, was not an employee or informant of the TCPD. He had spoken to Garcia before on a personal basis. He denied that Garcia had ever been offered financial or other incentives to take part in the investigation, and testified that it was departmental policy not to pay informants.

Sergeant Randle Burrows of the Galveston County Sheriff's Department testified that he fitted Garcia with the transmitter and operated the recorder throughout the period of surveillance. He did not tell Garcia how to operate or deactivate the transmitter, except that it could only detect conversations from a close proximity to Garcia.

Joe Haralson of the Texas Rangers testified that he was in radio communication with the surveillance van. He followed appellant and Woods to Garcia's apartment complex. He observed that Woods remained on the motorcycle in the parking lot while appellant went to Garcia's apartment. Woods had $1,500.00 on his person. Haralson further testified that he had been told that Garcia was a "proven informant" who had worked as an informant in the past and had given reliable information.

Richard Branson, Assistant Criminal District Attorney of Galveston County, testified that he was in the surveillance van.

He identified a baseball bat he had observed appellant take from appellant's truck to Garcia's car. He testified that he had advised Garcia to let appellant do the talking and not suggest anything. He also remembered that at some point while driving, the officers lost transmission but quickly regained it by changing routes; he suggested that that occurrence might account for a seven minute gap in the tapes. He characterized Garcia as a "cooperating individual" in the case rather than a confidential informant.

Appellant testified that he used cocaine and that Woods was a dealer of his who had sold him "trash." Appellant had unsuccessfully tried to get his money back from Woods and was eventually interested in "pulling a scheme" to get the money. He believed Garcia was qualified to help him and called Garcia about a money-making scheme but it was Garcia who initiated the idea of murder. Appellant told Garcia he had doubts, but Garcia persuaded him because Garcia was broke and needed the money. Appellant maintained that he had eventually so committed himself to Garcia and Woods that he could not withdraw from the plan.

Although appellant conceded his voice was on the tapes, he said he was high on cocaine, "running at the mouth," and did not have the intent to carry out his proposals. He further testified that Garcia had asked him to suggest "some things," and that towards the end of the last tape he told Garcia he could not go through with the plan. When he arrived with Woods at Garcia's apartment complex, he determined he could not follow through with the plan and told Woods to stay on the motorcycle while he would go upstairs. He planned to tell Garcia to call the plan off but when he arrived at Garcia's apartment, he was arrested.

Appellant's first ground of error alleges the trial court erred in overruling his motion on the defense of entrapment.

Appellant argues that the trial court apparently refused the entrapment charge because appellant testified and admitted certain elements of the offense.

Appellant contends that having admitted the acts charged but having denied criminal intent, he is still entitled to the entrapment instruction, citing a federal case, *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984).

Appellant's argument assumes the entrapment issue was raised by the evidence.

Tex.Penal Code Ann. § 8.06 (Vernon 1974) provides:

> (a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. *Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.*
>
> (b) In this section "law enforcement agent" includes personnel of the state and local law enforcement agencies as well as of the United States and any person acting in accordance with instructions from such agents.

Appellant's argument invokes the federal subjective entrapment test; but with the enactment of § 8.06 Texas adopted what is known as the "objective entrapment test." *Rodriguez v. State*, 662 S.W.2d 352, 355 (Tex.Crim.App.1984).

The objective test is capsuled in *Norman v. State*, 588 S.W.2d 340, 346 (Tex.Crim. App.1979):

> The objective entrapment test mandates that the trial court, having once determined that there was an inducement, need now consider only the nature of the State agent activity involved, without reference to the predisposition of the particular defendant.

The function of the objective test of entrapment is to deter police conduct which violates civilized society's standards for the proper use of governmental power. *Langford v. State*, 571 S.W.2d 326, 330 (Tex. Crim.App.1978). "In Texas, the objective test exemplifies the legislature's recogni-

tion that there will be some cases in which the defendant is accused, but the government is convicted." *Donnell v. State*, 677 S.W.2d 199, 202 (Tex.App. [1st Dist.] 1984, no pet.).

■ If evidence supporting the defense of entrapment is admitted, the issue is submitted to the jury with the instruction that a reasonable doubt on the issue requires an acquittal. Tex.Penal Code Ann. § 2.03(c), (d) (Vernon 1974).

■ However, the defense of entrapment is not available to a defendant who denies the commission of the offense. *Norman v. State*, 588 S.W.2d at 345. This is because a denial of the commission of the offense is inconsistent with entrapment, as this defense assumes that the offense was committed. *Id.*

■ The entrapment defense is available if the police specifically instruct their agents to use an improper procedure to "make a case" against an accused. *Rangel v. State*, 585 S.W.2d 695, 699 (Tex.Crim. App.1979). It is the element of inducement which is the sine qua non of the defense of entrapment. *Maddox v. State*, 635 S.W.2d 456, 458 (Tex.App.—Fort Worth 1982, no pet.).

The record reveals that Garcia acted voluntarily in cooperation with law enforcement officers. The evidence does not reveal and appellant has failed to point out any specific improper procedure the police officers used to "make a case" against appellant. The record shows that appellant actively pursued the arrangements for Wood's murder without inducement from Garcia. Garcia was only asked to wear a transmitter and follow appellant's plans.

■ The evidence shows, at best, that an opportunity was afforded appellant to commit the criminal solicitation. The evidence failed to show an inducement and the defense of entrapment was not raised. *Johnson v. State*, 650 S.W.2d 784, 789 (Tex. Crim.App.1983).

Appellant's first ground of error is overruled.

In appellant's second ground of error, he alleges that the trial court erred in overruling his motion to suppress State's exhibits nos. 2, 3, and 4 (three tape recordings in chronological sequence), and in his third ground, that the court erred in admitting the tapes into evidence because the tapes were garbled. He also complains that neither a sufficient predicate nor a proper chain of custody were established for the tapes' admission.

Appellant complains of frequent gaps in the tapes, most notably a seven minute gap in the second tape, as well as continual interference by police radios. Appellant argues that the tapes fail to reflect his renunciation of the plan in the last tape, as well as any inducement on the part of Garcia.

The following colloquy occurred after Burrows identified the tapes and prior to their admission:

(Whereupon, the following proceedings were held at the bench out of hearing of the jury.)

MR. STEVENS: (Defense Counsel): Your Honor, at a bare minimum I think the Jury is entitled to know there have been some deviations from chain of custody. I think we have established at the earlier hearing the police department that was holding these had some very rigorous standards for custody that have been breached in this case. That may or may not sway the Court to remove these tapes from the Jury, but the Jury is entitled to—

THE COURT: I can't hear.

MR. STEVENS: I am saying the better practice by far is to establish the chain first, and then offer them subject to proper objection. Because the Court has no way of predicting the testimony.

THE COURT: Be better to establish the chain, although I am of the opinion the chain is not essential. . . .

MR. CLARK: (the prosecutor): All I was asking of the Court, since we have had a hearing outside the presence of the Jury, we have seen the witnesses, what they have testified to, let me go ahead,

offer it now, and offer up any chain defects Mr. Stevens sees, and he can make his cross-examination.

THE COURT: The objection is if the chain is not shown, the tapes played, the damage is done.

MR. CLARK: I have showed it in the suppression hearing before, and it's time consuming, and very repetitious.

THE COURT: I will overrule the objection.

MR. STEVENS: Do I understand this is a conditional offer by the State, and come back, link up later?

THE COURT: State offering conditionally, you will show the chain of custody? .

MR. CLARK: Yes, sir.

(Whereupon, the following proceedings occurred in the courtroom within hearing of the Jury.)

THE COURT: Mr. Stevens, you made your objection, and it has been overruled, and I understand you have your objection to the playing of the tape?

MR. STEVENS: Yes, sir. It was overruled.

THE COURT: I understand, but you have a standing objection, I take it.

MR. STEVENS: Thank you.

■ Generally, to determine the admissibility of a tape recording, the court must first consider the relevancy of the tape and whether or not they are the original tapes. No one questions the relevancy of the tapes, or whether they are the originals. Once a court makes the foregoing determinations, it must then determine whether the proper predicate has been fulfilled.

■ The necessary predicate for the admission of tape recordings is outlined as follows: (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions had not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers; and, (7) a showing that the testimony elicited was voluntarily made without any kind of inducement. *Edwards v. State*, 551 S.W.2d 731, 733 (Tex.Crim.App. 1977). Reasonably strict adherence to the seven requirements is required for the admission of sound recordings, and their admission is discretionary with the trial court. *Id.*

■ A mere showing that a tape recording is handled in a standard specified manner does not establish a presumption of regularity, nor is it an indicia of reliability sufficient to insure the integrity of the fact-finding process commensurate with the rights of confrontation and cross examination. *Porter v. State*, 623 S.W.2d 374, 384 (Tex.Crim.App.1981); *McCrary v. State*, 604 S.W.2d 113, 115 (Tex.Crim.App. 1980).

■ The particular case in which the recording is offered is a part of the circumstances to be considered in determining whether the preservation of the recording, i.e. chain of custody, has the indisputable fundamental trustworthiness necessary for its admission into evidence. *McCrary v. State*, 604 S.W.2d at 115.

■ The burden is on the proponent to establish the necessary predicate. *United States v. Starks*, 515 F.2d 112, 122 (3d Cir.1975). The appellant does not complain that the conditions set out in *Edwards*, nos. (1), (2), (3), (6) and (7) have not been met. He complains that nos. (4) and (5) have not been established.

■ The determination of whether or not the proponent has complied with the proper predicate is discretionary with the trial court, and on appellate review, an abuse of this discretion must be shown before an appellate court can determine that the court has erred in admitting the tapes into evidence. *Chimelewski v. State*, 681 S.W.2d 166, 169 (Tex.App.—Houston [14th Dist.1984], no pet.) Further, a judgment will not be reversed for admission of evidence that did not injure the accused. *Self v. State*, 709 S.W.2d 662, 668 (Tex. Crim.App.1986).

With regard to appellant's complaint that *Edwards* requirement no. 4 was not met, i.e., "a showing that changes, additions, or deletions had not been made," the court in *Quinones v. State*, 592 S.W.2d 933, 944 (Tex.Crim.App.1980), noted that the alteration in a tape does not render the tape per se inadmissible. If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of the evidence, the recording can still be admitted. *Id.*

As to appellant's complaint that the predicate for *Edwards* requirement no. (5), "a showing of the manner of the preservation of the recording," has not been met, i.e., chain of custody, the controlling issue is not any specific manner of preservation or handling of the tapes within the control of public officials, but whether anything occurring during the handling and storage of the tapes affected their reliability and trustworthiness. Appellant put the State on notice that he questioned the manner of preservation and the handling of the tapes. When an attack such as this is made, it cannot shift to appellant the burden of disproving authenticity. *United States v. Starks*, 515 F.2d at 122. The proponent bears the burden of establishing the "chain of custody," that is, how the tapes were preserved and handled. The method of preservation, or chain of custody, is proven if an officer is able to testify that he took control of the item of physical evidence, identified it, placed it in a locked or protected area, and then retrieved the item being offered on the day of trial. *Elliott v. State*, 450 S.W.2d 863, 864 (Tex. Crim.App.1970). However, such irreproachable preservation is not always practical: the prosecutor must prepare his case for trial; the defense attorney is entitled to discovery; the grand jury is entitled to see, or hear, the evidence; the court may desire a transcription of the tapes or other situations may arise that would cause the evidence to be removed from the locked storage. The record of preservation must demonstrate to the court that nothing occurred that would affect the trustworthiness or reliability of the tapes. This does not mean that the court should resort to speculation in making its determination.

The record in this case reveals that State's witness Burrows testified that the tapes offered were the original tapes. He identified the persons on the tapes as Garcia and appellant, and testified that the tapes fairly and accurately reflected the conversations as he had heard them.

Burrows further testified that he never heard appellant renounce the plan, or heard anything that would tend to exculpate appellant. To prevent accidental erasures and/or alterations, Burrows had removed the tabs from the tapes, according to standard policy, and immediately turned them over to Officer Scalia. He explained that unclear portions of the tapes were the result of more powerful police radio interference with Garcia's body transmitter. He also testified that the tapes covered conversations spanning over six hours, but were only one and a half hours in length because he would start the tape when appellant approached Garcia's vehicle and stop the tape when appellant exited. He admitted that, because he was preoccupied with the audio equipment, he did not have the parties in his vision the entire time. He explained that Garcia's microphone was never deactivated, so he knew there were no contacts between appellant and Garcia that were not taped. Burrows testified he had listened to the original tapes after the initial recording was made and again prior to trial while in the custody of the District Attorney, and had determined that they had not been changed or altered in any way.

Officer Scalia testified that he received the tapes the morning of April 25, 1985, from Burrows. The tapes were kept in the police department evidence room locked in a steel cabinet. One of the precautions he took with the tapes was to guard against the possibility of magnetic contact, and thus prevent accidental erasures. Scalia also testified that the TCPD routinely checked out tapes to the District Attorney's office, but that it would be a breach of

TCPD police policy for anyone to take the tapes home with them. Scalia also testified that the tapes were checked out on April 25, 1985, by Goetschius for transcription by Carol Grady of the TCPD, in an office with no public access. On April 30, 1985, Grady gave the tapes back to Goetschius who took them to the grand jury. The tapes were returned to Scalia on June 25, 1985, and were released to Clark the next day.

In the hearing on the motion to suppress the tapes, Scalia testified as follows:

DEFENSE COUNSEL: Do you have an opinion as to their [the tapes'] reliability[?]

OFFICER SCALIA: Yes, I do.

DEFENSE COUNSEL: What is your opinion?

OFFICER SCALIA: They would not be reliable, if, in fact, they were removed from the premises.

DEFENSE COUNSEL: By premises, you are referring to the police department?

OFFICER SCALIA: That's correct.

DEFENSE COUNSEL: Now, I take it premises would also include some other public building staffed by law enforcement people?

OFFICER SCALIA: That's correct.

DEFENSE COUNSEL: But involve anybody's private residence, yours, the D.A.'s, anyone elses?

OFFICER SCALIA: That's correct.

MR. STEVENS: Pass the witness, Your Honor.

THE COURT: Mr. Clark?

REDIRECT EXAMINATION—By Mr. Clark

STATE: Officer Scalia, I think we went over this once.

You sign out evidence periodically to the District Attorneys staff for prosecution of cases; is that correct?

OFFICER SCALIA: Yes, I do.

STATE: When you got that hypothetical question, would it make any difference to you if in the hypothetical the individual was a D.A. you released that tape to? I guess it come down to the trustworthiness of the individual, doesn't it?

OFFICER SCALIA: Yes it does.

The 7 minute gap in the second tape was explained through the testimony of State's witness Branson, who was with Officer Burrows during the surveillance. He testified that at some point during surveillance, the police lost transmission from Garcia's microphone and that this accounted for the gap.

Carol Grady of the TCPD testified that she was the secretary for the Chief of Police and, during the time that she had the tapes for transcription in April, 1985, she was very careful and locked them up in the Chief's office when not transcribing. Upon completion of her transcription, the tapes were immediately returned to Officer Scalia's possession.

Michael Clark, Assistant Criminal District Attorney of Galveston County, and the prosecutor in this case, testified that he had reviewed the tapes. He officially checked the tapes out from Officer Joe Scalia of the TCPD on June 26, 1985. He testified that authorized personnel "sign out" for tapes as he did. He kept the tapes for approximately two weeks in preparation of the case for trial. Part of the time they were at his house and the last few days he returned them to his office. Clark listened to the tapes at home and made duplicates of them on his own equipment, for defense counsel. His wife, an attorney, was the only other resident in the home and she worked during the day. While making duplicate copies to give to the defense, he attempted to "clean up" some of the static in the duplicate copies. There is no evidence that this was done to the original tapes. The tapes remained in his home stacked with several other cassettes in an area where third parties would not normally bother them, for two weeks at the outmost. His home was protected by a burglar alarm system and locked doors. The docket sheet reflects that the hearing on the motion to suppress was July 5, 1985, and that the tapes at that time were under the control of the court. Based upon the

record, Clark had the tapes from June 26, 1985, to July 5, 1985 when they were taken to court. Based on Clark's testimony and on the record, the tapes were in his home about 5 days, and about 3 days in his office before the hearing on the motion to suppress. Clark testified that, to his knowledge, no one bothered the tapes. He may have had guests in his home during this period but never saw anyone listen to the tapes. He had played portions of the tapes, however, in the presence of Branson in preparation for trial. Clark subsequently returned the tapes to his office which he shared with another Assistant District Attorney named Burris. Defense counsel had made a request to review the tapes and because he (Clark) was in trial, he told defense counsel that he could go to his office and listen to them in the presence of Burris. Defense counsel wanted to wait until Clark was present. Clark further testified that he did not request that special safeguards be taken by Burris but stated that there was an implied understanding between them that she would look after his evidence and he would do the same for her. He admitted that he did not know if Burris was in the office the entire time of possession of the tapes. Finally, Clark testified that he had listened extensively to the original tapes and that to his knowledge, they had not been altered.

The tapes were a recording of a personal conversation between the State's witness, Garcia, and appellant. Garcia was in court, duly sworn, and subject to cross-examination by appellant. Garcia testified that at no time did appellant say he didn't "want to" or "couldn't go through with" the plan. He testified that at the very end (of the recording), he tried to get appellant not to go through with the crime, but that appellant insisted, saying "Man, this is a sure thing." According to Garcia, appellant stated he was sure he wanted to go through with the plan, and gave Garcia his watch and ring as security. He also gave Garcia a baseball bat for Garcia to put in the bedroom of Garcia's apartment to be used to kill the victim.

We note from the record that the court carefully went through and established, with Scalia's testimony, the "chain of custody" a second time. When Clark checked the tapes out on the 26th of June, there was evidence that Clark took some precaution in his home and office, that is, he placed the tapes in a special spot in his home that was not readily accessible, and in his office where he kept them protected with the help of another District Attorney. It is further apparent from the evidence that there was no evidence of any specific alterations of the original tapes, but only speculations of possible alterations. As appellant's attorney acknowledged in the record, no one questioned the trustworthiness of Assistant District Attorney Clark. This acknowledgment was supported by Officer Scalia's testimony that the reliability of the tapes in the possession of a district attorney is in direct proportion to his trustworthiness.

 We find that the court did not abuse its discretion in admitting the tapes, and that their admission did not cause the rendition of an improper verdict.

Appellant's second and third grounds of error are overruled.

Appellant's fourth ground of error alleges the trial court erred in overruling his motion for mistrial, following the allusion by State's witness Goetschius to a polygraph test allegedly given to Garcia.

Prior to trial, the trial court had granted appellant's motion in limine pertaining to and excluding any reference to polygraph exams allegedly given to Garcia.

The line of testimony complained of developed on cross-examination of Goetschius:

Q. Now, the other day I think you told us this Robert Garcia was just a casual acquaintance; is that correct?

A. Professionally, yes.

Q. Stopped in from time to time and talked with him?

A. Yes.

Q. Never got any information of any kind from him?

A. No, other than casual conversation.

Q. Can you account for the reason why Officer Haralson would have been told by somebody at your Police Department that he had on several times before given reliable information?

A. I believe what we're referring to that Robert had taken a test and he had been proven to be telling the truth.

At this point, defense counsel approached the bench and moved for a mistrial. The trial court denied the motion, ruled that the statement was nonresponsive, and instructed the jury to disregard it:

> We will have to go back a bit to the exact question asked of Officer Goetschius, and I think the Officer's response was not directly in response of that question, and I sustain your objection as the answer not being responsive. I don't know if you recall exactly what the answer was, some moments back, but I would instruct you to disregard the answer given by Officer Goetschius to the last question.

Appellant argues that Goetschius' response was an attempt to bolster the testimony of Garcia and was highly prejudicial. Appellant's counsel, not the State, elicited the statement complained of.

█ Appellant cites no authority, cases or statutes, in support of his contention. The failure by appellant to brief the ground of error or to cite any authority, presents nothing for review. *Eubanks v. State*, 635 S.W.2d 568, 572 (Tex.App.—Houston [1st Dist.1982], no pet.).

Appellant's fourth ground of error is overruled.

The judgment of the trial court is affirmed.

COHEN, J., concurs.

SAM BASS, J., dissents.

COHEN, Justice, concurring.

The issue dividing this panel is whether a tape recording should be excluded from evidence because of a possibility that it has been altered. I would require more than a possibility, as outlined below.

Further, I find the authorities relied on in the dissenting opinion unpersuasive. Of the five cases cited in the dissenting opinion, only two reversed judgments. One of these did not involve tape recordings, and the other, a federal case from Pennsylvania, resulted from a grossly unfair trial, involving Government misconduct and judicial errors unlike anything that occurred here. Both cases are discussed below.

Appellant never proved, by expert or other evidence, that these tapes had been altered. Further, he never proved that if they had been altered, the alteration would have been impossible to detect with present technology. If alteration had been proved, I would vote to reverse, assuming that there was a reasonable probability that the alteration affected the missing, allegedly exculpatory conversations.

I would also vote to reverse, without conclusive proof of alteration, if: (1) appellant reasonably claimed that a prejudicial alteration had occurred; (2) the manner of preserving the tapes showed that there was a reasonable opportunity for such an alteration; and (3) expert testimony showed that, given present technology, there was no reasonable probability that an alteration could be detected. In these circumstances, the penalty of excluding the tapes from evidence should fall on the State, because of the possibility of alteration, the State's exclusive ability to prevent alteration, and the impossibility of the defendant ever proving alteration.

Appellant proved that exposure to certain levels of magnetism could erase the tapes, but he never proved that the tapes were or probably were exposed to such magnetism or that alteration by magnetism or by "static" removal would have been impractical or impossible to detect. For all we know, an expert witness, using readily available technology, could have examined these tapes and reliably determined whether they had been altered. However, unlike the defendant in *United States v. Starks*,

515 F.2d 112 (3rd Cir.1975), cited in the dissenting opinion, appellant never requested an expert examination. If such an examination had shown no alteration, there would have been no error in admitting the tapes. Further, if such an expert examination *could* have proved a prejudicial alteration, appellant should have produced such evidence. A party's failure to present available evidence, including expert testimony, may suggest that it was not produced because it would have hurt his case.

We should not assume that the tapes were altered, and therefore exclude them, nor should we relieve appellant from having proved that they were altered, unless he showed at trial that such proof could not reasonably be made. Reasons that such proof could not be made might include technological impossibility or extreme difficulty or expense amounting to impracticality.

This case differs from *Easley v. State,* 472 S.W.2d 128 (Tex.Crim.App.1971), which had nothing to do with tape recordings. In *Easley,* a marijuana conviction was reversed because the State failed to prove chain of custody. The reason for requiring a chain of custody over scientifically tested evidence, such as marijuana, is to guarantee that the scientist has tested the same item that the police officer seized—not an altered, contaminated, or different item. The testimony concerning the pre-test handling of a tested substance may enable the defendant to show that the way the evidence was handled between its seizure and its testing made it more likely that the test result would favor the State or less likely that it would favor the defendant. That reason for requiring chain of custody does not exist in this case, because the tape recordings were never scientifically tested. *See generally, Teague, Texas Criminal Practice Guide,* section 73.05(12) (Bancroft Whitney 1986). *Compare United States v. Starks,* 515 F.2d 112, 118–24 (3rd Cir.1975), which differs from the present case in the following respects:

1) Defense counsel prior to trial requested that an expert examine the tape to determine if it was original or had been altered in any way;

2) The tape admitted in evidence was never identified as the original;

3) The tape admitted in evidence was "much clearer" than the one furnished to defense counsel before trial, which was "inaudible and untrustworthy";

4) The tape's whereabouts were unknown in the four months before trial;

5) The court refused to play for the jury the tape that had been furnished to defense counsel before trial;

6) The court refused to order disclosure to the defense of government employees who had had custody of the tape in the four months before trial.

Finally, I do not consider Officer Scalia's testimony sufficient to show that the tapes were unreliable, as a matter of law, thus requiring their exclusion. While he testified that tapes removed from police premises would not be reliable, Scalia never testified to actual or probable alteration or to the impossibility of proving alteration. No one testified that particular conditions surrounding the storage and handling of *these* tapes exposed *them* to significant risks of alteration from magnetism or other specific hazards. Taken as a whole, Scalia's testimony amounts only to a distrust of the tapes because they were removed from his custody, where careful procedures were routinely followed in order to guarantee security. While this testimony may be entitled to great weight, it goes only to the weight, not the admissibility, of the evidence.

SAM BASS, Justice, dissenting.

I respectfully dissent to the majority's disposition of the chain of custody problem.

At the outset, I must emphasize that I can find no authority in Texas that squarely addresses the chain of custody issue in the context presented. However, I feel that issue must not be sidestepped.

The necessary predicate for the admission of tape recordings is outlined as follows: (1) a showing that the recording de-

vice was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) the establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) *a showing of the manner of the preservation of the recording;* (6) the identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement. *Edwards v. State,* 551 S.W.2d 731, 733 (Tex.Crim. App.1977). Reasonably strict adherence to the seven requirements is required for admission of sound recordings, and their admission is discretionary with the trial court. *Id.*

The *Edwards* requirements do not mean, however, that any alteration in a tape renders the tape per se inadmissible. *Quinones v. State,* 592 S.W.2d 933, 944 (Tex. Crim.App.1980). If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of the evidence, the recording can still be admitted. *Id.*

In the instant case, there was an attempt to explain or account for the gaps or alterations in the tapes; however, the controlling issue in this case is the chain of custody problem.

In *Elliott v. State,* 681 S.W.2d 98, 103 (Tex.App.—Houston [14th Dist.] 1984), *aff'd.,* 687 S.W.2d 359 (Tex.Crim.App.1985), the seven requirements for the admissibility of tape recordings were met because, among other things, there was testimony that the tapes were locked in an evidence locker and remained in police custody precluding any changes, additions, or deletions *and that the tapes remained in the locker until the day of the trial. See also Hoover v. State,* 707 S.W.2d 144, 147 (Tex.App. —Houston [14th Dist.] 1986, no pet.). In *Easley v. State,* 472 S.W.2d 128 (Tex.Crim. App.1971), a break in the chain of custody mandated reversal. In that case, the evidence in question, marihuana, was mailed to the Department of Public Safety in Austin by mistake and then forwarded to the lab in Dallas. The chemist could not testi-fy as to whether the package was opened in Austin and there was no evidence as to what happened to the evidence while it was in Austin. Further compounding the break in the chain of custody, the sheriff who had first acquired the evidence could not make a positive identification of the marihuana. There was a period when the evidence was in the control of unknown persons, and there was no evidence that these persons had not opened the package containing the evidence.

It is self-evident that tape recordings are not readily identifiable as the original version and are peculiarly susceptible to alteration, tampering, and selective editing. *United States v. Starks,* 515 F.2d 112, 121 (3rd Cir.1975). Because proffer of such evidence may, in the particularized circumstances of a given case, involve one or more of these problems in varying degrees it is difficult to lay down a uniform standard for the admission of a tape recording, equally applicable to all cases. *Id.* The regularity which attaches to the handling of evidence within the control of public officials will not overcome the chain of custody problem. *Id.* at 122.

Officer Scalia testified that it would be a breach of TCPD policy for someone to take the tapes home with them, and he further testified that the prosecutor, Assistant District Attorney Clark, did not tell him where he was taking the tapes. Clark testified that he kept the tapes for one to two weeks at his home and office, in the presence of third parties, and failed to take requisite precautions to safeguard them. Clark admitted that he did not know that tapes could be magnetically erased, that while the tapes were at his office, they were on top of his desk where third parties could have had access to them, and that he failed to request that special safeguards be taken with respect to the tapes by Assistant District Attorney Burris with whom he shared that office. There is also some evidence that Clark may have tampered with the original tapes in the process of duplicating them and producing "cleaned up" copies. There is no evidence when the tapes were

returned to the police department. The tapes were offered into evidence at the second hearing on the motion to suppress on July 8, 1985.

Such an unorthodox chain of events is clearly what a properly maintained chain of custody is designed to prevent and provides the basis for Officer Scalia's testimony that tapes would be unreliable once removed from the police department. My colleagues argue that if discrepancies in the tapes are sufficiently explained, the requirement of an unbroken chain of custody is satisfied. I disagree. It is my opinion that chain of custody and alteration are two separate issues; satisfaction of the former is the threshold requirement.

The preservation of a proper chain of custody is even more imperative here because of the nature of the offense charged—any renunciation on the part of appellant or instigation on the part of Garcia would have been probative. Appellant's testimony that he renounced the plan towards the end of the last tape is in fact corroborated by his subsequent conduct in eventually leaving Woods in the parking lot while approaching and entering Garcia's apartment alone.

I agree with appellant that in these circumstances, the State had ample means, without the tapes, to relate the substance of the overheard conversations through the recollection of Garcia and the attending police officers.

Appellant put the State on notice that he questioned the tapes' authenticity. "If there is a presumption of regularity it cannot in these circumstances substitute for evidence or shift to [appellant] the burden of disproving authenticity." *United States v. Starks*, 515 F.2d at 122.

It is my opinion that the State has failed to meet the predicate set forth in *Edwards v. State* by failing to establish the proper and adequate chain of custody.

I would reverse the judgment and remand the cause for a new trial.