MEMORANDUM OPINION



No. 04-03-00291-CR


Guadalupe SANDOVAL, 

Appellant


v.


The STATE of Texas,

Appellee


From the 25th Judicial District Court, Guadalupe County, Texas

Trial Court No. 02-0893-CR

Honorable Dwight E. Peschel, Judge Presiding


Opinion by: Sandee Bryan Marion, Justice


Sitting: Alma L. López, Chief Justice

 Karen Angelini, Justice

 Sandee Bryan Marion, Justice


Delivered and Filed: June 30, 2004


AFFIRMED



 A jury found defendant, Guadalupe Sandoval, guilty of murder and assessed a punishment of
seventy-five years' confinement and a $10,000 fine. Defendant complains of his conviction in six
issues on appeal. We affirm.


BACKGROUND

 On the evening of September 19, 1992, the night of the Diez y Seis festival in Seguin, Texas,
police were called to St. Andrews Episcopal Church, where they found the body of Eglena Deleon
lying between some bushes at the corner of the church. Police later determined that she died due to
strangulation and a stab wound to the neck. The police conducted a search of the surrounding area,
which revealed a blue bandana in a storm drain a few blocks from the church. The police interviewed
numerous people who attended the festival that night. From these interviews, the police were able
to develop a description of a potential suspect: a man in dark clothing with the sides of his head
shaved, wearing his hair pulled back in a ponytail. This led the police to several suspects whose
unique hairstyle matched the description, including defendant, Guadalupe Sandoval. Even though
the police initially investigated several suspects who matched the description, they were not able to
make an arrest until ten years later in 2002. The police were finally able to make an arrest based on
DNA testing conducted in 2002 on the bandana recovered the night of the murder. These tests
revealed both the victim's and the defendant's DNA on the bandana. Based on these test results, the
police arrested defendant.

SUFFICIENCY OF THE EVIDENCE

 In the defendant's sixth issue, he asserts the evidence is factually insufficient to support his
conviction. In our review of the factual sufficiency of the evidence, we view all the evidence and we
will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis v.
State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). We must defer to the factfinder, and may find
the evidence factually insufficient only where necessary to prevent manifest injustice. See Cain, 958
S.W.2d at 407. The trier of fact may draw reasonable inferences and is the exclusive judge of the
witnesses' credibility and the weight to give their testimony. Jones v. State, 944 S.W.2d 642, 647-49
(Tex. Crim. App. 1996). The standard of review is the same in both direct and circumstantial
evidence cases. Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

 Here, the State presented a case based entirely upon circumstantial evidence. The State called
witnesses to establish defendant was seen talking to Deleon the night of her murder and that he was
seen around the church about the time the murder occurred. One witness testified that as he was
leaving the festival, he saw a Hispanic man with a ponytail arguing with a young woman and that the
man was holding the girl by the throat and wrists. This same witness positively identified defendant
in court.

 Two other witnesses testified that they saw defendant, acting nervous, on the church grounds
between 11:30 p.m. and 11:45 p.m. the night of the murder. They both heard a sound, either a
gasping sound or a "pssst" sound, and they observed the defendant walk towards the sound and
after a minute or two, they saw him walk away. About a week after the murder, one of these
witnesses identified defendant in a police photo lineup. 

 Defendant's wife testified the defendant came to her house in the early morning hours
following the murder wearing clothes that were different than the ones he wore to the festival and that
rather than wearing his normal ponytail, his hair was messed up and puffed out. She also testified that
the day the composite sketch of the suspect appeared in the Seguin newspaper, her husband asked
her to cut his hair, which she did. While cutting his hair, defendant asked his wife to lie and tell the
police that she had met him at the festival around 10:15 pm. During trial, the jury was shown
photographs of defendant taken shortly after the murder that showed him covered with superficial
scratches on his arm, chest, and on the left side of his face. His wife testified she did not scratch
defendant and she did not know how he got the scratches, but that he would sometimes get scratches
during his workouts. 

 Finally, the State offered the piece of evidence it contends connects defendant to the murder:
the bandana containing both the victim's and defendant's DNA. The State's witnesses testified that
the blue bandana found near the crime scene the night of the murder was analyzed in March of 2002.
Blood stains on the bandana were consistent with the victim's DNA and a whitish-yellowish stain on
the bandana were consistent with the defendant's DNA.

 Defendant argues that the evidence the State produced was highly contested and
circumstantial. He asserts none of the State's witnesses could positively identify him with the victim
and most of the witnesses' identifications were "tentative" or based on his hairstyle. Defendant
elicited testimony from the State's witnesses that many people attending the festival that night had
the same type of hairstyle, including other suspects in the case. In addition, one of the police officers
testified defendant said he cut his hair because his father recommended the idea to him after seeing
a composite sketch of the murder suspect in the local newspaper. Of the two witnesses who testified
they identified defendant at the crime scene, one of them misidentified defendant in a photo array the
police compiled shortly after the murder. Defendant also brought forward a witness who testified that
one of the initial suspects in the case, Jesse Rangel, threatened him stating he would "slit his throat
like he slit hers." In addition, other witnesses testified they saw Rangel spend time with Deleon the
night she was murdered. Defendant argued that Rangel did not deny the accusation that he had killed
Deleon, but instead just laughed it off. Rangel was serving a sentence for another murder during
defendant's trial. 

 Defendant asserts that while the State portrayed him as a knife collector, it did not offer
evidence that one of his knives was used to kill the victim. He argues that even though the police
collected all of his knives and bandanas for testing, none of the items connected him to the murder.
Shortly after the murder, the police searched defendant's car, which they described as "messy," and
tested the items they found inside the car, none of which linked defendant to the murder. Defendant
argued that because his car was messy, any traces of substances that connected him to the murder
would have remained in the car. Further, a forensic expert testified that with the amount of blood
found at the crime scene, defendant would have had traces of blood in his car if he had killed Deleon,
yet the State did not produce any such evidence. In addition to the knives and items found in the car,
the police collected and tested the shoes defendant wore that night; however, the test results did not
connect him to the murder. Because of the scratches on defendant's body, the police tested forensic
samples found on the victim and under her finger nails. However, none of the samples tested matched
defendant and the police did not attempt to identify the true owner of the samples. The police also
found samples of hair in Deleon's hands that did not match defendant's hair. Finally, defendant
argues that the bandana, the State's key piece of evidence that allegedly linked him to the murder,
had many flaws. He contends the police improperly collected the bandana and subjected it to possible
contamination. Defendant argued a DPS forensic expert did not test all of the stains on the bandana
because the previous expert had not noted them in his notes or because they contained insufficient
amounts of DNA. Further, one of the DPS experts could not state whether someone intentionally
placed defendant's DNA on the bandana or whether the presence of defendant's DNA on the bandana
resulted from police mishandling. Because of the possibility of contamination, defendant argues the
bandana hardly adds to the cumulative force of the State's evidence.

 Viewing this evidence in an impartial light, we conclude the jury's verdict is not so contrary
to the overwhelming weight of the evidence as to be clearly wrong and unjust.

MISTRIAL

 In his first issue, defendant contends the trial court erred when it denied his motion for a
mistrial. Defendant argues the State improperly commented during its closing argument on his
constitutional right not to testify. Although defendant's arguments invoke both state and federal
constitutional protections, he has not separated his issues on appeal in such a way as to argue a
separate ground of relief under the Texas Constitution. Therefore, we must assume that he is
claiming no greater protection under the Texas Constitution than that provided by the United States
Constitution. Muniz v. State, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993). 

 A prosecutor cannot comment on a defendant's failure to testify because such a comment
violates the privilege against self-incrimination and the freedom from compulsion to testify contained
in the Fifth Amendment of the United States Constitution and Article I, section 10, of the Texas
Constitution. Bustamante v. State, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001). A prosecutor's
statement constitutes a direct comment on a defendant's failure to testify if it references evidence that
only the defendant can supply. Silva v. State, 989 S.W.2d 64, 66 (Tex. App.--San Antonio 1998,
pet. ref'd). To determine if the offending language violated a defendant's right against
self-incrimination, we must view it from the jury's standpoint. Bustamante, 48 S.W.3d at 765. The
prosecutor's reference must make a clear implication to the defendant's failure to testify and language
that merely implies or indirectly alludes to the defendant's failure to testify is insufficient. Id. This
standard requires us to test whether the prosecutor used language that was "manifestly intended or
was of such a character that the jury would necessarily and naturally take it as a comment on the
defendant's failure to testify." Id. We apply this standard by viewing and analyzing the context in
which the prosecutor made the comment in order to determine if the prosecutor used language of
such a character. Id. 

 The comment in question occurred during the State's closing argument. In attempting to
explain to the jury a case based entirely upon circumstantial evidence, the prosecutor stated the
following: 

 . . . You use circumstantial evidence all the time in your own lives. You may not even
realize it. Let me give you an example. I think, most of you from your juror cards, if
I remember, have kids. Let's say you left one day and you said, Little Johnny, I've got
to go to the store for a minute. I'm going to leave you here. Little Johnny may be 8
or 9 years ago [sic]. I'll just be gone for [sic] few minutes, but while I'm gone, you
stay out of the chocolate-chip cookies in the cookie jar, whatever you do. You may
not have them. They're going to spoil your supper. I've told you before, and I want
you to make sure you don't do it. And little Johnny said, yes, mom or dad, and you
go away to the store. When you come home, what you find is the top is off the cookie
jar. There's fewer cookies than when you left. There's a trail of crumbs on the floor.
And when you get to Johnny, he's got crumbs and chocolate chips on his T-shirt.
Now, little Johnny may invoke his Fifth Amendment privilege and not tell you what he
did. . .


 Before the prosecutor could continue with his analogy, the following exchange occurred
between the prosecutor, defense counsel, and the judge:

Defense counsel: Objection, Your Honor, commenting on defendant's right not to
testify.


Prosecutor: It certainly was not intended, Your Honor.

Court: Don't do it again.

Defense counsel: I request the jury disregard. 

Court: Ladies and gentlemen of the jury, [the prosecutor's] last comment about little
Johnny invoking his Fifth Amendment right not to testify, I instruct you to disregard
that part of his argument.


Defense counsel: And as the law requires, Judge, I must ask for a mistrial.

Court: Denied. 

Defense counsel: Thank you.

Defendant argues that while the prosecutor used an analogy to describe a case based on
circumstantial evidence, the statement "little Johnny may invoke his Fifth Amendment privilege and
not tell you what he did" clearly indicates the State was drawing a parallel between the facts of the
case and defendant's failure to testify. However, the State argues that the prosecutor in no way
intended to comment on defendant's failure to testify and the statement was not a direct comment on
defendant's failure to testify because it did not refer to evidence that could come only from defendant.

 The prosecutor's analogy describes a parent coming home to find a trail of circumstantial
evidence leading to their son, little Johnny, whom they find surrounded by evidence of his
mischievousness, and when everything seems to point to little Johnny, he refuses to tell his parent
what happened. This analogy directly parallels the State's explanation of why the trail of
circumstantial evidence incriminates defendant. The final statement of little Johnny invoking his Fifth
Amendment right not to tell his parent what happened clearly refers to defendant's silence. The jury
could only naturally and necessarily take the statement as referring to defendant's failure to come
forward with an explanation as to why the evidence should not incriminate him. The law is clear that
a prosecutor cannot comment on a defendant's failure to testify and to allow a prosecutor to craft a
clever analogy, such as the one here, would undermine the rule itself. Therefore, viewed from the
jury's standpoint, we conclude the trial court properly sustained defendant's objection that the
prosecutor commented on defendant's failure to testify. However, although we conclude the
prosecutor unwisely and improperly commented on defendant's failure to testify, we believe the trial
court promptly cured the error. 

 In cases where an error occurs in front of the jury, we presume that judicial admonishments
are efficacious, and consequently, a mistrial is an extreme remedy permissible only when a judicial
admonishment cannot cure the prejudice. See Kemp v. State, 846 S.W.2d 289, 308 (Tex. Crim. App.
1992); Waldo v. State, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988); Gardner v. State, 730 S.W.2d
675, 696 (Tex. Crim. App. 1987). Further, the presumption that an instruction to disregard generally
will not cure a comment on the failure of the accused to testify only applies to the most blatant
examples. Moore v. State, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999). Absent a blatant comment,
the trial court's instruction to disregard will cure the error. Id. 

 The prosecutor's analogy occurred at the beginning of his closing argument. The prosecutor
abandoned his analogy once defendant objected and the trial court instructed him not to continue with
it. The trial court also immediately instructed the jury to disregard the prosecutor's comment on little
Johnny's invocation of his Fifth Amendment right. Therefore, we conclude that the comment here
was not so inflammatory that the trial court could not cure it by instruction, and that the court did not
abuse its discretion by refusing the requested mistrial.

CHAIN OF CUSTODY

 In his second issue, defendant contends the trial court erred in admitting the bandana into
evidence because the State failed to prove the chain of custody so as to make the evidence admissible.

 The Texas Rules of Evidence require a showing that the evidence is what the State claims it
to be. See TEX . R. EVID. 901(a); See also Silva, 989 S.W.2d at 67-68. The State conclusively
establishes the chain of custody if an officer testifies that he seized the item of physical evidence,
tagged it, placed an identifying mark on it, placed it in evidence storage, and retrieved the item for
trial. Avila v. State, 18 S.W.3d 736, 739 (Tex. App.--San Antonio 2000, no pet.) Similarly, when
the State sends the evidence to a laboratory for analysis, it must introduce testimony showing the
laboratory handled the evidence the same way in order to conclusively establish the chain of custody.
Id. Once the State completes the chain of custody from the initial collection of the evidence to inside
the laboratory, most questions concerning care and custody, including gaps and minor theoretical
breaches, go to the weight of the evidence, not to its admissibility. Id.; Silva, 989 S.W.2d at 68. 

 The State called Officer Watson, Sergeant Limmer, and Officer Rosas from the Seguin Police
Department to testify as to the bandana's chain of custody. Through these witnesses, the State
established that the police collected, secured, tagged, identified, and maintained the bandana as
evidence in storage during all periods of time the police had custody of the bandana. The State also
established that the bandana remained in the sealed envelope in the police property room while in
police possession. This period of time included the period prior to and subsequent to the occasions
police released the bandana to DPS for testing. All three of the officers identified the bandana at trial
as the bandana the police collected the night Deleon was murdered. The State also called Patricia
Graham and Chad Hainley from DPS, to testify as to the care and handling of the bandana during the
times DPS examined and tested it. The State established through their testimony that they secured
and tested the bandana according to proper procedure to avoid contamination. Both experts testified
that the bandana the State offered into evidence was the bandana they received from the police
department. 

 Defendant argues the State failed to authenticate the bandana as containing his DNA when
it was initially discovered. He contends the State failed to prove the chain of custody because of the
great potential for contamination throughout the testing process. However, after reviewing the entire
testimony of the police officers and the experts who examined the bandana, we cannot agree.
Because the bulk of defendant's arguments concerning care and custody, including gaps and minor
theoretical breaches, go to the weight of the evidence and not its admissibility, we conclude the trial
court did not err in admitting the bandana into evidence.

AUTOPSY PHOTOGRAPHS

 In his third issue, defendant contends the trial court erred in admitting into evidence, over his
objection, two autopsy photographs. Defendant argues that the State violated the trial court's
discovery order when it did not provide the photographs to defense counsel prior to trial.

 Criminal defendants do not have the general right to discover evidence in the State's
possession. Scaggs v. State, 18 S.W.3d 277, 294-95 (Tex. App.--Austin 2000, pet. ref'd).
However, the trial court has discretion as to decisions involving pretrial discovery of evidence that
is not exculpatory, mitigating, or privileged. King v. State, 746 S.W.2d 515, 517 (Tex. App.--Dallas
1988, pet. ref'd). A trial court may order limited discovery of evidence within the State's possession,
custody, and control. See Tex. Code Crim. Proc. Ann. art. 39.14(a) (Vernon Supp. 2004). As a
general rule, the trial court should exclude any evidence the State willfully withholds from disclosure
under a discovery order. King, 746 S.W.2d at 517; Hollowell v. State, 571 S.W.2d 179, 180 (Tex.
Crim. App. 1978). 

 However, when the trial court admits the evidence, we review its decision under an abuse of
discretion standard. See King, 746 S.W.2d at 517. We may consider the bad faith of the State and
defendant's reasonable anticipations. Id. If we determine the trial court erred in admitting the
evidence, we must next determine whether the defendant was harmed by the State's failure to
produce the evidence. Cooks v. State, 844 S.W.2d 697, 734 n.32 (Tex. Crim. App. 1992). To
constitute harm, the evidence withheld in violation of the trial court's order must be of such a nature
as to have affected the outcome of the trial in the defendant's favor. Id. Elements that establish a
potential effect on the trial's outcome include: (1) suppression of evidence after a request by the
defense; (2) the evidence was favorable to the defense; and (3) the evidence was material. Id.
However, the mere possibility that an item of undisclosed information might have helped the defense,
or might have affected the outcome of the trial, does not establish materiality. Quinones v. State, 592
S.W.2d 933, 941 (Tex. Crim. App. 1980). We determine whether evidence is material by evaluating
it in the context of the entire record. Id.

 On August 14, 2002, the trial court ordered the State to make available to defendant "all
documents and photographs and investigative charts or diagrams" that it intended to introduce at
trial. During trial, the State offered numerous photographs including two medical examiner pre-autopsy photographs of Deleon to illustrate the cause of death by choking and a stab wound in the
side of her neck. Defendant argues that he did not know of these photographs until trial because the
State did not include them with its produced discovery. However, defendant does not point us to any
evidence in the record demonstrating the State willfully withheld the photographs or acted in bad
faith. Further, these two photographs were not favorable to defendant's case and, on appeal,
defendant offers only mere possibilities of how the photos affected the outcome of the trial. On
appeal, defendant contends his attorney was unable to research the admissibility of the photographs
and was unable to seek expert advice on their significance - arguments defendant did not raise at trial.
Defendant's only objections before the trial court - complaints he does not raise on appeal - were
that the photographs were inflammatory and their inflammatory nature outweighed any probative
value. 

 We conclude that even if the trial court erred in allowing the photographs into evidence,
defendant has not demonstrated how he was harmed.

MOTION TO TRANSFER VENUE

 In defendant's fourth and fifth issues, he argues the trial court erred in denying his motion to
transfer venue because (1) he demonstrated that he could not receive a fair trial in Guadalupe County
because of pre-trial publicity and a dangerous combination of individuals and (2) the trial court's
order resulted in the jurors having to walk through the crime scene area on their way to court each
day for trial. 

 A trial court may grant a defendant's change of venue motion if he demonstrates he cannot
obtain a fair and impartial trial in the county where the State commences prosecution because of the
existence of a great prejudice against him, or because there is a dangerous combination of influential
persons against him. See Tex. Code Crim. Proc. Ann. art. 31.03(a)(1), (2) (Vernon 1989). When
a defendant presents the trial court with a motion to change venue, the trial judge must act as
fact-finder with regard to the issue presented. Id. at art. 31.04; Willingham v. State, 897 S.W.2d 351,
357 (Tex. Crim. App. 1995). Because the trial court is in a better position to resolve such issues, we
will affirm the trial court's judgment absent evidence of an abuse of discretion. Willingham, 897
S.W.2d at 357. 

 A defendant is entitled to a change of venue if he can establish there are community influences
that could affect the answers on voir dire or the testimony of witnesses at trial, or that for any other
reason, he could not receive a fair and impartial trial at the place of venue. See Bell v. State, 938
S.W.2d 35, 46 (Tex. Crim. App. 1996). However, the mere fact of media attention and publicity do
not automatically establish prejudice or require a change of venue because jurors need not be in total
ignorance of the facts and issues of a particular case. Id. Instead, the test is whether outside
influences affecting the community's climate of opinion as to a defendant are inherently suspect.
Willingham, 897 S.W.2d at 357. In order to prevail on a motion to change venue, a defendant must
prove that publicity about the case is pervasive, prejudicial, and inflammatory. Id. A defendant must
demonstrate actual, identifiable prejudice attributable to pre-trial publicity on the part of the
community from which the jury is chosen. Id.

 Here, defendant's evidence in support of his motion to transfer venue consisted of two
affidavits containing general allegations that defendant could not receive a fair trial because: (1)
inflammatory and prejudicial newspaper articles and radio broadcasts created a great prejudice against
him; (2) a "dangerous combination of [influential] individuals" existed; and (3) jurors would not obey
the trial court's instructions to not visit the crime scene because the jurors were "required to visit the
scene" on their way to and from the courthouse. Defendant also relied on his own affidavit in which
he referred to a statement made at his bond reduction hearing describing the murder as "brutal and
notorious." Defendant did not offer any newspaper articles or press coverage into evidence; he did
not offer any evidence identifying or explaining the "dangerous combination" of influential people;
and he presented no evidence to support his contention that jurors would disobey the trial court's
instruction to not visit the crime scene.

 To controvert defendant's affidavits, the State called to the witness stand three individuals
from various professions in the county. The witnesses testified that they were unaware of any pre-trial publicity that would make it impossible for defendant to receive a fair and impartial trial and they
were not aware of any conspiracy to deny defendant a fair and impartial trial. One of the witnesses
agreed the murder was brutal, but he did not recall this murder receiving any more or less publicity
than any other murder in Guadalupe County. A second witness said he thought enough time had
passed since the murder "to allow things to cool down."

 Based on this record, we cannot say the trial court erred when it denied defendant's motion
to transfer venue. 

CONCLUSION

 We overrule defendant's issues on appeal and affirm the trial court's judgment.


 Sandee Bryan Marion, Justice

DO NOT PUBLISH